STATE OF NORTH CAROLINA v. JOHN SCOTT BADGETT

No. 522A04

(Filed 4 May 2007)

## 1. Evidence— prior crimes or bad acts—killing of another victim—similarity—remoteness in time

The trial court did not err in a capital first-degree murder case by denying defendant's motion in limine under N.C.G.S. § 8C-1, Rule 404(b) to exclude evidence related to defendant's 1992 killing of another victim, because: (1) with respect to the similarity requirement, the murder in the instant case and the 1992 killing exhibited remarkable parallels when both crimes involved a fatal stab wound to an unarmed victim's neck with a folding pocketknife which occurred during an argument with the victim in the victim's home; (2) as to the temporal proximity requirement, the trial court may properly exclude prison time resulting from the previous conviction in its determination of whether that conviction is too remote in time to the present crime, and defendant was in prison for five of the ten years between the 1992 killing and the 2002 murder in the present case, leaving only five years between the two crimes; and (3) the trial court did not abuse its discretion under N.C.G.S. § 8C-1, Rule 403 by admitting the 1992 killing when the trial court guarded against the possibility of unfair prejudice by instructing the jury to consider such evidence for the limited purposes allowed by Rule 404(b), and these limiting instructions also specifically admonished the jury not to consider the challenged evidence on the issue of defendant's character.

## 2. Evidence— prior crimes or bad acts—prior conviction for voluntary manslaughter—harmless error

The trial court committed harmless error in a capital first-degree murder case by admitting evidence that defendant had previously been convicted of voluntary manslaughter, because: (1) contrary to the State's contention, waiver did not occur when the testimony admitted was the same testimony to which defendant had raised the objection overruled by the trial court, and was not later testimony accepted without objection; (2) defendant's reference to his prior conviction in closing argument did not result in waiver when the trial court had admitted evidence of defendant's previous conviction, and defendant was entitled to make a reasonable and bona fide effort to explain and minimize

the impact of this evidence in closing argument without risking waiver; and (3) although it was error to admit evidence from a detective that defendant had been previously convicted of manslaughter when defendant did not testify during the guilt-innocence phase of this case, defendant failed to demonstrate any reasonable possibility that the jury would have reached a different result had the evidence been excluded.

3. **Constitutional Law— right to presence—drawing random names from pool of prospective jurors**

Defendant's right to presence was not violated in a capital first-degree murder trial when the clerk allegedly drew random names from the pool of prospective jurors outside of defendant's presence, because: (1) nothing in the record suggests that the clerk failed to draw prospective jurors at random, in open court, and in defendant's presence; (2) defendant's theory that the clerk could have failed to properly carry out a routine task rests on pure speculation; and (3) even assuming that the clerk's random draw was not performed in defendant's presence, this fact does not necessarily entitle defendant to a new trial when even though the instant record does not indicate that the clerk formally spoke the names of prospective jurors on the record, the clerk nevertheless drew names of prospective jurors at random, in open court, and in defendant's presence.

4. **Constitutional Law— right to presence—bailiff's reminders to prospective jurors to refrain from discussing case or reading media accounts**

The bailiff's reminders to prospective jurors in a capital first-degree murder case to refrain from discussing the case or reading media accounts of the case violated defendant's right to presence but were harmless beyond a reasonable doubt because: (1) the record reflects the specific instructions the trial judge sought to have administered to the jury because the trial judge explicitly told the bailiff the substance of the instructions and asked him to pass them along to the jury, and nothing in the record suggests that the bailiff failed to instruct the jury as the trial judge requested; and (2) a reminder by the bailiff to prospective jurors and the jury itself to abide by the court's admonitions should not be considered an instruction as to the law, since communications such as these do not relate to defendant's guilt or innocence.

**5. Constitutional Law— right to presence—trial judge met with jury to thank them for service before discharging them**

Defendant's right to presence was not violated in a capital first-degree murder case when the trial judge met with the jurors to thank them for their service before discharging them, because: (1) the jury's service was complete at the time the trial judge thanked and discharged the jury outside of defendant's presence since the meeting occurred after the jury had delivered its unanimous verdict and been polled at defendant's request, and after the trial court recorded the verdict; (2) even if defendant were entitled to a re-polling of the jury under these circumstances, he never asked the trial court to do so; and (3) as a practical matter, our Supreme Court failed to see what a second polling of the jury under these circumstances would have accomplished, as the only plausible explanation for why the jury marked "no" on the verdict form as to each mitigating circumstance at issue is that the jury simply did not find the existence of those mitigating circumstances. N.C. Const. art. I, § 23.

**6. Sentencing— mitigating circumstances—mental or emotional disturbance**

The trial court did not err in a capital first-degree murder case by failing to submit the N.C.G.S. § 15A-2000(f)(2) mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance, because: (1) two of defendant's experts made no mention of intermittent explosive disorder or any other disorder that would require the submission of the (f)(2) mitigator; (2) the lone expert who diagnosed defendant with intermittent explosive disorder did so as a preliminary diagnosis offering no evidence or testimony to explain the specific symptoms of this disorder or how such symptoms would have affected defendant at the time of the crime, she reached her preliminary diagnosis without following the recommended practice of first ruling out all other disorders associated with aggressive impulses and without ruling out potential malingering, and she also admitted that she eventually retreated from her initial preliminary diagnosis after learning about defendant's calculated attack on another inmate while in prison which she believed was inconsistent with intermittent explosive disorder; (3) the testimony supporting defendant's claim that he suffered from intermittent explosive disorder was inadequate and highly controverted at best; (4) the trial court's

refusal to admit the (f)(2) mitigating circumstance is appropriate when the events before, during, and after the killing suggest deliberation, and not the frenzied behavior of an emotionally disturbed person; (5) nothing tantamount to substantial evidence of brain damage was introduced into evidence at defendant's trial, and to the contrary, the evidence introduced revealed the plain inability of defendant to control his temper when the mentally disabled victim pointed at defendant and yelled; and (6) an inability to control one's temper is neither mental nor emotional disturbance as contemplated by the (f)(2) mitigator.

**7. Sentencing— mitigating circumstances—impaired capacity**

The trial court did not err in a capital first-degree murder case by failing to submit the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance that the murder was committed while the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, because: (1) for the same reasons that defendant's argument as to the (f)(2) mitigator failed, defendant's argument here fails as well when there is insufficient evidence in the record that defendant suffered from intermittent explosive disorder; and (2) the same evidence of deliberation which makes submission of the (f)(2) mitigator improper also makes submission of the (f)(6) mitigator improper when defendant's initial lies to police about his involvement in the murder and his washing and disposal of the murder weapon tended to show that defendant fully appreciated the criminality of his conduct.

**8. Constitutional Law— competency to stand trial—failure to order competency hearing**

The trial court did not err in a first-degree murder case by failing to order a competency hearing sua sponte in the presence of an allegedly bona fide doubt as to defendant's competency to stand trial, because: (1) the statutory right to a competency hearing is waived by the failure to assert that right at trial, and nothing in the instant record indicates that the prosecutors, defense counsel, defendant, or the court raised the question of defendant's capacity to proceed at any point during the proceedings, nor was there any motion made detailing the specific conduct supporting such an allegation; (2) the evidence referenced by defendant did not constitute substantial evidence requiring the trial court to institute a competency hearing, and there was evidence indicating that defendant was competent to stand trial, including

STATE v. BADGETT

[361 N.C. 234 (2007)]

that defendant was able to interact appropriately with his attorneys during the trial, he conferred with them on issues of law applicable to his case, he followed their advice by declining to testify during the guilt-innocence phase, he responded directly and appropriately to questioning during the capital sentencing proceeding as well as to the trial court's inquiries throughout the trial, he demonstrated a strong understanding of the proceedings against him, and he consistently addressed the trial court with appropriate deference and intelligent responses; (3) although the record confirms that defendant was treated for anger management and depression prior to trial, this evidence was insufficient to establish a lack of competency; and (4) our Supreme Court was unable to conclude that defendant's desire for a speedy trial resulting in a death sentence indicates a lack of competence to stand trial. N.C.G.S. § 15A-1001(a).

## 9. Sentencing— death penalty—proportionality

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was found guilty of first-degree murder on the basis of malice, premeditation and deliberation, and under the felony murder rule; (2) there was substantial evidence of premeditation and deliberation including that defendant stabbed the victim, then physically restrained him from using his telephone to call for help before watching him bleed to death, at some point in the struggle defendant also used the pocketknife to slash the victim's right arm leaving a significant wound, and the folding pocketknife used to murder the victim had to be pulled open before it could be used; (3) the jury found the existence of the (e)(3) aggravating circumstance based upon the defendant's prior killing, and the jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate; (4) defendant murdered the victim in the victim's home; and (5) the victim had shown defendant compassion by allowing him to stay overnight as a guest in the victim's home on an occasion weeks prior to the murder, as well as on the night of the murder, and in exchange for the victim's kind willingness to provide defendant with shelter from the cold November temperatures, defendant repaid the victim's compassion by taking his life.

Justice HUDSON did not participate in the consideration or decision of this case.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge John O. Craig, III, on 6 May 2004 in Superior Court, Randolph County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 11 September 2006.

*Roy Cooper, Attorney General, by John H. Watters, Special Deputy Attorney General, and Rudy Renfer, Assistant Attorney General, for the state.*

*James R. Glover for defendant-appellant.*

MARTIN, Justice.

On 3 March 2003, John Scott Badgett (defendant) was indicted for the armed robbery and first-degree murder of Grover Arthur Kizer (victim). Defendant was tried capitally at the 19 April 2004 criminal session of Randolph County Superior Court. Defendant's conviction for first-degree murder was based on a theory of malice, premeditation, and deliberation, and the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death. The trial court entered judgment accordingly and arrested judgment on the robbery conviction. Defendant gave notice of appeal pursuant to N.C.G.S. § 7A-27(a).

The evidence admitted during the guilt-innocence phase of defendant's trial tended to show the following: On or about 20 November 2002, defendant went to the victim's house looking for a place to spend the night. The victim had allowed defendant and another friend to stay the night at his home a few weeks earlier. On this occasion, the victim again offered defendant shelter.

At some point in the evening the victim, who suffered from a mental disability, began complaining to defendant about his next-door neighbors. He explained to defendant his belief that the police had failed to respond adequately to complaints he had made against the neighbors. At some point, the victim began yelling about "workers of iniquity" and pointing his finger at defendant.

Defendant argued briefly with the victim, then opened a folding pocketknife and stabbed him in the neck. The stabbing severed the victim's right carotid artery and damaged his trachea, Adam's apple, and windpipe. As blood squirted from his neck, the victim ran to a telephone in his kitchen. Defendant followed the victim into the kitchen and slashed the victim's right arm with the pocketknife, leav-

.ing a deep wound. The victim picked up the telephone to call for help, but defendant pushed him away from the phone, knocking him to the floor. The victim fell prostrate, dying within a few minutes.

Once the victim was dead, defendant stole the victim's wallet containing his driver's license and five dollars in cash. Defendant then ransacked the victim's house, stealing a substantial amount of cash from a set of envelopes in the victim's bedroom, as well as a flashlight. Defendant then returned to his residence, where he hid evidence of the murder. Defendant later traded the murder weapon for five dollars worth of crack cocaine.

A few days later, defendant returned to the victim's house and entered by using the stolen flashlight to break a glass door at the rear of the house. Defendant stole numerous collectable coins of value, some of which he later exchanged for drugs. Defendant also stole clothing, a butcher knife, a cigarette lighter bearing an inscription of the victim's name, a number of coins in saving containers, wrist watches, and a pocket watch. Finally, he stole keys to the victim's house and vehicles. Defendant then left in the victim's truck, leaving the house in disarray with coins strewn across the floor.

Defendant became a suspect when the stolen truck linked him to the murder. Police had recovered the stolen truck, which contained numerous collectable coins belonging to the victim. When police apprehended defendant, he was in possession of one of the victim's coins. Police brought defendant to the Asheboro Police Department for questioning. Defendant initially lied about the murder, but admitted to staying at the victim's home approximately two weeks earlier and riding in the victim's truck. Defendant eventually gave police a signed confession, which described the details of the murder.

Defendant's description of the murder matched the evidence police later recovered from defendant's residence. This evidence consisted of most of the items defendant stole from the victim, as well as defendant's blood-stained shoes from the night of the murder. Additionally, police later recovered the murder weapon and traced it to defendant.

The details of defendant's confession also matched the story defendant told James Parker and Randy Marks, two individuals with whom defendant was incarcerated at different times following his arrest. According to Parker, defendant admitted that he had stabbed the victim because the victim was "running his mouth."

The state also introduced evidence that defendant had killed another individual, J.C. Chriscoe, in October 1992. On that occasion, defendant had attempted to obtain marijuana from Chriscoe's roommate, who sold him tobacco instead. When defendant went to confront Chriscoe's roommate, Chriscoe answered the door and quickly became angry with defendant. The two exchanged blows, and defendant ran up a flight of stairs to the second floor of the house. Chriscoe, who was unarmed, followed defendant into a bedroom. The fight ended when defendant stabbed Chriscoe in the neck with a folding pocketknife. Defendant confessed the details of this killing to police and provided them with a statement. Police were able to recover the pocketknife used to kill Chriscoe· in the neighborhood in which defendant lived at the time. Defendant was convicted of voluntary manslaughter for killing Chriscoe.

Defendant offered no evidence in the guilt-innocence phase. Additional evidence admitted during the capital sentencing proceeding tended to show the following:

After defendant pled guilty to voluntary manslaughter in 1993 for killing Chriscoe, defendant received counseling while incarcerated to address anger management issues. At trial, defendant described the counseling program as "kind of silly," and admitted that he eventually decided not to complete it.

After serving his sentence for manslaughter, defendant took up residence in Randolph County. Within six months, he resumed his use of alcohol and cocaine. Defendant sought and obtained treatment for substance abuse and received anger management counseling. After completing the treatment program, defendant stayed at a halfway house and later a boarding house. He was asked to leave that location, however, and afterwards had no place to live. After a brief stay with an acquaintance, defendant began sleeping in a storage room next to a grocery store. On one occasion, however, the victim allowed defendant to sleep in his house along with Tim Morris, a friend of defendant's from prison who knew the victim. On the night defendant killed the victim, defendant had come to the victim's house seeking shelter from the cold November temperatures outside.

After being charged with murder in the instant case, defendant once again sought counseling. Defendant met with a psychologist, Dr. Thomas Ansbro, and two psychiatrists, Dr. Thomas Gresalfi and Dr. Elizabeth Pekarek. All three mental health care providers concluded that defendant suffered from irritability, anger management prob-

lems, and depression. Additionally, Dr. Pekarek tentatively diagnosed defendant with Tourette's Disorder, intermittent explosive disorder, and prominent antisocial traits. During one of his follow-up visits, however, defendant informed Dr. Pekarek that he had stabbed another inmate after waiting for hours for an ideal opportunity to commit the assault. Acknowledging that such planned, deliberate attacks were inconsistent with intermittent explosive disorder, Dr. Pekarek retreated from her initial diagnosis of intermittent explosive disorder. Neither Dr. Ansbro nor Dr. Gresalfi diagnosed defendant with intermittent explosive disorder.

Defendant admitted in open court that he killed the victim and recounted the details of the murder, which matched his previous confession to police. In addition, defendant admitted that he: (1) watched the victim die after pushing him to the floor; (2) cleaned the victim's blood off the murder weapon in the victim's sink; and (3) asked his cellmate's mother to retrieve the victim's wallet after he was arrested for the murder.

Defendant admitted to the following violent acts over the previous seventeen years: (1) assaulting a coworker with a barstool in 1987; (2) assaulting a houseguest with a barstool in 1991; (3) assaulting an individual at a party in 1992; (4) fatally stabbing Chriscoe in 1992; (4) stabbing another inmate while in prison in 1994; (5) assaulting another·inmate in the head in 1997; (6) assaulting another individual in 2000; (7) murdering the victim in 2002; and (8) stabbing another inmate while in jail awaiting trial in the instant case.

Defendant concluded his direct testimony in the penalty phase with the following statement: "I just would like this to stop somewhere. You have the power to stop the seventeen-year-span of violence that I've left behind. I'm just tired of causing everyone pain." This implicit request for the death penalty was consistent with defendant's earlier behavior. Prior to trial, defendant wrote numerous letters to the trial court and the Randolph County District Attorney expressing his desire for a speedy trial resulting in a death sentence.

Additional facts and descriptions of events at trial, as necessary to an understanding of defendant's arguments, are set forth below.

## GUILT-INNOCENCE PHASE

[1] Defendant first contends the trial court erred by denying his motion *in limine* to exclude evidence related to defendant's 1992 killing of J.C. Chriscoe under N.C. R. Evid. 404(b). After thoroughly

comparing the facts of the 1992 killing with those of the instant case, the trial court found that "there are sufficient similarities to allow the evidence to come in under [Rule 404(b)] and that it would be probative for the jury to hear [evidence of the 1992 killing] in order to prove intent or preparation or plan, motive, perhaps even absence of mistake." On appeal, defendant does not assign error or otherwise argue to this Court that it was error to admit this evidence as proof of intent, preparation, plan, motive, or absence of mistake. Rather, defendant argues only that the prior killing of J.C. Chriscoe was too dissimilar and remote in time to be admitted under Rule 404(b), and that any probative value was substantially outweighed by unfair prejudice to defendant. Defendant's argument is without merit.

N.C. R. Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

This Court has recognized that "Rule 404(b) is a 'rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.'" *State v. Hyatt*, 355 N.C. 642, 661, 566 S.E.2d 61, 74 (2002) (quoting *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphasis omitted in original)), *cert. denied*, 537 U.S. 1133 (2003). The Rule, however, is "constrained by the requirements of similarity and temporal proximity." *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002) (citations omitted). "When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value." *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *vacated and remanded on other grounds*, 494 U.S. 1023 (1990). Similarly, "[w]hen otherwise similar offenses are distanced by significant stretches of time, commonalities become less striking, and the probative value of the analogy attaches less to the acts than to the character of the actor." *Id.*

In the instant case, the admission of evidence of the 1992 killing of Chriscoe satisfied both the similarity and temporal requirements of

Rule 404(b). With respect to the similarity requirement, the murder in the instant case and the 1992 killing exhibited remarkable parallels. Both crimes involved a fatal stab wound to an unarmed victim's neck with a folding pocketknife, which occurred during an argument with the victim in the victim's home. We conclude that these crimes are sufficiently similar for purposes of Rule 404(b). *See State v. Carter*, 338 N.C. 569, 588-89, 451 S.E.2d 157, 167-68 (1994) (holding that evidence of a previous assault committed by the defendant satisfied the similarity requirement of Rule 404(b) when both the previous offense and that for which the defendant was tried involved a blow above the right eye with a brick-like object), *cert. denied*, 515 U.S. 1107 (1995); *see also State v. Hipps*, 348 N.C. 377, 404-05, 501 S.E.2d 625, 641-42 (1998) (holding that evidence of a previous murder committed by the defendant satisfied the similarity requirement of Rule 404(b) when both the previous offense and that for which defendant was tried involved similar knife wounds and head trauma to the victim), *cert. denied*, 525 U.S. 1180 (1999).

As to the temporal proximity requirement, the trial court may properly exclude prison time resulting from the previous conviction in its determination of whether that conviction is too remote in time to the present crime. *State v. Lloyd*, 354 N.C. 76, 91, 552 S.E.2d 596, 610 (2001) ("It is proper to exclude time defendant spent in prison when determining whether prior acts are too remote." (citations and internal quotation marks omitted)); *see also, e.g., State v. Riddick*, 316 N.C. 127, 134, 340 S.E.2d 422, 427 (1986) (noting that "incarceration effectively explain[ed] the remoteness in time"). Here, defendant was in prison for five of the ten years between the 1992 killing and the 2002 murder in the present case, leaving only five years between the two crimes for purposes of the temporal requirement. As a result, the introduction of the challenged evidence satisfied the temporal requirement of Rule 404(b). *Cf. Hipps*, 348 N.C. at 405, 501 S.E.2d at 642 (holding that introducing evidence of crime committed seventeen years earlier did not violate temporal proximity requirement); *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991) (holding that introducing evidence of act committed ten years earlier did not violate temporal proximity requirement).

Defendant further argues, however, that even if evidence of the 1992 killing is admissible under Rule 404(b), the trial court should have excluded it under N.C. R. Evid. 403. Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." The exclusion of evidence under Rule

403 is a matter generally left to the sound discretion of the trial court, *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986), which is left undisturbed unless the trial court's ruling "is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133, *cert. denied*, 510 U.S. 948 (1993).

Here, the trial court did not abuse its discretion under Rule 403 by admitting evidence of the 1992 killing of Chriscoe. Rather, on each occasion in which evidence of Chriscoe's killing was offered, the trial court guarded against the possibility of unfair prejudice by instructing the jury to consider such evidence for the limited purposes allowed by Rule 404(b). These limiting instructions also specifically admonished the jury not to consider the challenged evidence on the issue of defendant's character. *See, e.g., Hyatt*, 355 N.C. at 662, 566 S.E.2d at 74-75 (holding admission of prior bad acts not unfairly prejudicial under Rule 403 when trial court gave extensive limiting instruction regarding permissible uses of 404(b) evidence); *State v. Lemons*, 348 N.C. 335, 353, 501 S.E.2d 309, 320 (1998) (same), *vacated and remanded on other grounds*, 527 U.S. 1018 (1999). Therefore, the trial court did not abuse its discretion by allowing the admission of this evidence.

**[2]** Defendant next argues that the trial court erred in admitting evidence that defendant had been convicted of manslaughter for killing Chriscoe. At trial, the state was permitted to introduce testimony from Detective Jim Briles indicating that defendant had previously been "convicted" of voluntary manslaughter. Defendant argues that such evidence is not admissible under Rule 404(b), and that North Carolina Rule of Evidence 609 only allows certain evidence related to a prior conviction for the limited purpose of impeaching a witness. Thus, defendant contends, under *State v. Wilkerson*, 356 N.C. 418, 571 S.E.2d 583, *rev'g per curiam*, 148 N.C. App. 310, 559 S.E.2d 5 (2002) (for reasons stated in dissenting opinion, 148 N.C. App. at 318-29, 559 S.E.2d at 10-17 (Wynn, J., dissenting)), evidence of his prior conviction for manslaughter was inadmissible since he did not testify at trial.

As a preliminary matter, we pause to consider the state's contention that defendant waived this argument. The state first argues the waiver rule applies to the introduction of evidence of defendant's conviction because the same evidence was later admitted without objection. Though " '[i]t is well established that the admission of evidence without objection waives prior or subsequent objection to the

admission of evidence of a similar character,' " *State v. Augustine*, 359 N.C. 709, 720, 616 S.E.2d 515, 525 (2005) (quoting *State v. Nobles*, 350 N.C. 483, 501, 515 S.E.2d 885, 896 (1999) (alteration in original) (citations and internal quotation marks omitted)), *cert. denied*, —— U.S. ——, 126 S. Ct. 2980 (2006), this rule is inapplicable here.

In the instant case, Detective Briles testified to defendant's prior conviction for killing Chriscoe, at which time defendant promptly interrupted this testimony by objecting. The trial court overruled defendant's objection and allowed Detective Briles to finish his sentence uninterrupted. Detective Briles then informed the jury that defendant had been convicted of manslaughter. Thus, the testimony admitted was the same testimony to which defendant had raised the objection overruled by the trial court, and not "later testimony . . . accepted *without objection*" as the state contends. As such, waiver did not occur.

The state also contends that defendant's reference to his prior conviction in closing argument amounts to waiver of his earlier objection to Detective Briles' testimony concerning defendant's conviction. This Court has previously held, however, that "[a]n objecting party does not waive its objection to evidence the party contends is inadmissible when that party seeks to explain, impeach, or destroy its value." *State v. Anthony*, 354 N.C. 372, 408, 555 S.E.2d 557, 582 (2001), *cert. denied*, 536 U.S. 930 (2002); *see also State v. Godwin*, 224 N.C. 846, 847-48, 32 S.E.2d 609, 610 (1945) (holding that an "adverse party may . . . explain the evidence, or destroy its probative value, or even contradict it with other evidence," without risking waiver (quoting *Shelton v. S. Ry. Co.*, 193 N.C. 670, 675, 139 S.E. 232, 235 (1927))). This corollary to the waiver rule "represents a commendable effort to rescue objecting counsel from the dilemma . . . of leaving the objectionable evidence unexplained and unrebutted or losing the benefit of an objection by pursuing the matter further on cross-examination or by other evidence." 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 22, at 94 (6th ed. 2004) [hereinafter Broun]. To that end, this Court has looked to whether "counsel was making a reasonable and bona fide effort at explanation or denial, or was simply producing additional evidence of the facts that had already been testified to over an objection." *Id.*; *see also State v. Aldridge*, 254 N.C. 297, 300, 118 S.E.2d 766, 768 (1961) (explaining that whether waiver occurs "depend[s] largely upon the nature of the evidence and the circumstances of the particular case").

On these facts, defendant's reference to his prior conviction in closing argument did not result in waiver. As the trial court had admitted evidence of defendant's previous conviction, defendant was entitled to make a reasonable and bona fide effort to explain and minimize the impact of this evidence in closing argument without risking waiver. We therefore conclude that counsel's reference to defendant's manslaughter conviction in closing argument did not waive defendant's earlier objection to the admission of the same evidence. *See Anthony*, 354 N.C. at 408, 555 S.E.2d at 582 (holding that defendant's attempt on cross-examination to explain evidence given by a witness for the state did not result in waiver).

Turning to defendant's argument, we observe that the introduction of evidence that defendant had previously been convicted of manslaughter was error in light of *Wilkerson*, 356 N.C. 418, 571 S.E.2d 583, *rev'g per curiam*, 148 N.C. App. 310, 559 S.E.2d 5 (2002) (for reasons stated in dissenting opinion, 148 N.C. App. at 318-29, 559 S.E.2d at 10-17 (Wynn, J., dissenting)). In *Wilkerson*, we adopted the dissenting opinion of the Court of Appeals, which concluded that evidence of the defendant's prior convictions was inadmissible where the state had also introduced evidence of the underlying facts and circumstances of the convictions. 148 N.C. App. at 318-29, 559 S.E.2d at 10-17 (Wynn, J., dissenting). Thus, although Rule 609 may permit certain evidence of a defendant's prior conviction to be admitted if the defendant testifies, *see, e.g.*, *State v. Lynch*, 334 N.C. 402, 408-09, 432 S.E.2d 349, 352 (1993), it is error to admit evidence of the defendant's prior conviction when the defendant does not testify, *see Wilkerson*, 148 N.C. App. at 327-29, 559 S.E.2d at 16-17 (Wynn, J., dissenting). *See generally* Broun § 94, at 272 n.164 (noting that *Wilkerson* "seems to remove any doubt with regard to this issue"). Here, because defendant did not testify during the guilt-innocence phase, it was error to admit evidence from Detective Briles that defendant had been "convicted" of manslaughter for the 1992 killing of Chriscoe.

The improper admission of a defendant's prior conviction is not, however, reversible per se. *See State v. Ross*, 329 N.C. 108, 121, 405 S.E.2d 158, 165-66 (1991) (concluding the admission of evidence that the defendant had previously been convicted of a crime in violation of Rule 609 is reviewable for harmless error); *State v. McKoy*, 317 N.C. 519, 529, 347 S.E.2d 374, 380 (1986) (holding that admission of evidence in violation of Rule 404(b) was harmless error). Rather, "[d]efendant has the burden under N.C.G.S. § 15A-1443[a] of demonstrating that but for the erroneous admission of this evidence [in vio-

lation of Rule 404(b)], there is a reasonable possibility that the jury would have reached a verdict of not guilty." *State v. Burr*, 341 N.C. 263, 291, 461 S.E.2d 602, 617 (1995) (internal quotation marks omitted), *cert. denied*, 517 U.S. 1123 (1996).

There was no dispute at trial that defendant killed the victim by stabbing him in the neck. Defendant authorized his trial attorneys to admit that fact during the opening statements of counsel. Indeed, defendant's only defense during the guilt-innocence phase was that he lacked the requisite intent for first-degree murder. Defendant asserts that the evidence of his prior conviction "helped convince the jury that the homicide was first-degree murder and not a lesser crime." We disagree.

The jury heard myriad evidence that defendant killed Chriscoe in 1992, including that defendant confessed the crime to police. In light of this overwhelming and uncontroverted evidence, defendant's argument that the trial court's admission of the bare fact of his previous manslaughter conviction materially impacted the jury's decision must necessarily fail. Because defendant has failed to demonstrate any reasonable possibility that the jury would have reached a different result had the evidence been excluded, *see* N.C.G.S. § 15A-1443(a) (2005), the trial court's admission of defendant's 1993 manslaughter conviction was harmless.

**[3]** Defendant next argues that the trial court deprived him of his right to presence under the Confrontation Clause of the Constitution of North Carolina, which provides in pertinent part: "In all criminal prosecutions, every person charged with crime has the right . . . to confront the accusers and witnesses with other testimony . . . ." N.C. Const. art. I, § 23. "Although the United States Supreme Court has stated that the confrontation clause of the federal constitution guarantees each criminal defendant the fundamental right to personal presence at *all critical stages* of the trial, our state constitutional right of confrontation has been interpreted as being broader in scope, guaranteeing the right of every accused to be present at *every stage* of his trial." *State v. Huff*, 325 N.C. 1, 29, 381 S.E.2d 635, 650-51 (1989) (citations omitted), *vacated and remanded on other grounds*, 497 U.S. 1021 (1990). Moreover, "[w]e have interpreted the state constitutional protection afforded the capital defendant as being even broader, guaranteeing the accused not only the right to be present at each and every stage of trial, but also providing that defendant's right to be present cannot be waived, and imposing on the trial court the duty to insure defendant's presence at trial." *Id.* at 29, 381 S.E.2d at

651; *State v. Moore*, 275 N.C. 198, 208, 166 S.E.2d 652, 659 (1969) ("[I]t is well established in this State that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging him with a capital felony." (citations omitted)).

Defendant argues that his right to presence was violated when the clerk allegedly drew random names from the pool of prospective jurors outside of defendant's presence. The first instance occurred on 21 April 2004, when defendant was present in the courtroom. The following colloquy took place:

THE COURT: Okay. We have all the jurors here. Now how do you—Counsel, how do you wish to draw the next twelve names? Do you want her to do that in here and then we can just have the clerk go to the jury pool room and call those twelve names out and then we move them to this other room, or do you want to bring them—Any preference?

MR. BELL
[DEFENSE
COUNSEL]: No preference, [y]our Honor.

THE COURT: All right then, Ms. Eubanks, when you get finished you can just go to the jury room and call out the names of the next twelve, and then Mr. Hill can take them to the jury room over here.

The second instance occurred on 23 April 2004, with defendant again present in the courtroom:

THE COURT: . . . We've selected eight jurors so far. My initial thought is to call out twelve more names, which would give us eighteen for today, and then send everybody else home till Monday morning. Do you think that will be sufficient?

MR. ROOSE
[DEFENSE
COUNSEL]: Yes, sir. I was looking at my—I kind of invented this little log that I really enjoy. We talked to fourteen on Wednesday, which is when we went all day. Yesterday was slower with the orientation and everything. So I'd say eighteen, I don't think we're going to run out if we have eighteen here.

STATE v. BADGETT

[361 N.C. 234 (2007)]

THE COURT: Okay. Then Mr.—If you'll get Mr. Hill twelve new names out of the ones that are in the jury assembly room, and then we'll call those names and have them stay. Well, let's see. We probably won't get through six—Do you think we'd get through six by lunch time?

THE CLERK: No. Sorry.

. . .

THE COURT: Okay. Here's what we'll do then. Pick out, call out twelve names, tell them to be back after lunch, say around 1:30, 1:45, something like that. Then the remainder that have not been called out will not have to come back until Monday morning at 9:30.

The third instance occurred on 26 April 2004, and again, defendant was present in the courtroom. The trial judge asked the clerk to draw seven more names of prospective jurors:

THE CLERK: We've got Number Eleven.

THE COURT: Oh, we do. Okay. I'm sorry.

THE CLERK: Yeah, we have Number Eleven.

THE COURT: Okay. I'm sorry. My fault. So we only have one more.

THE CLERK: And then ever how many alternates you're going to have.

THE COURT: Okay. Any suggestions from counsel?

MR. BELL
[DEFENSE
COUNSEL]: I think twelve would be a gracious plenty for the morning, [y]our Honor, please.

THE COURT: Okay. All right. Let's do that then.

THE CLERK: You want me to pull seven more?

THE COURT: Pull seven more, send everybody else home until 2:00. Tell them to report back at 2:00.

Nothing in the record suggests that the clerk failed to draw prospective jurors at random, in open court, and in defendant's presence. In essence, defendant's theory that the clerk could have

**STATE v. BADGETT**

[361 N.C. 234 (2007)]

failed to properly carry out this routine task "rests on pure speculation." *State v. Daughtry*, 340 N.C. 488, 508, 459 S.E.2d 747, 756 (1995) (concluding that the defendant failed to establish that any error occurred when portion of selection process for prospective jurors for defendant's capital trial took place outside his presence), *cert. denied*, 516 U.S. 1079 (1996). Accordingly, as in prior cases involving a capital defendant's unwaivable right to presence, "[w]e will not assume error 'when none appears on the record.' " *Id.* at 517, 459 S.E.2d at 762 (quoting *State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968)); *see also State v. Thompson*, 359 N.C. 77, 114, 604 S.E.2d 850, 876 (2004) (refusing to recognize violation of right to presence "unless and until defendant demonstrates constitutional error on the record"), *cert. denied*, 546 U.S. 830 (2005); *State v. Adams*, 335 N.C. 401, 410, 439 S.E.2d 760, 764 (1994) ("[W]hatever incompleteness may exist in the record precludes defendant from showing that error occurred . . . ."), *cert. denied*, 522 U.S. 1096 (1998).

Even assuming that the clerk's random draw was not performed in defendant's presence, however, this fact does not necessarily entitle defendant to a new trial. Although a capital defendant's state constitutional right to presence is unwaivable, these errors are subject to harmless error review. *State v. Bonnett*, 348 N.C. 417, 431, 502 S.E.2d 563, 573 (1998), *cert. denied*, 525 U.S. 1124 (1999); *State v. Buckner*, 342 N.C. 198, 227-28, 464 S.E.2d 414, 430-31 (1995), *cert. denied*, 519 U.S. 828 (1996). N.C.G.S. § 15A-1214(a) governs the clerk's selection of potential jurors, and simply requires the clerk to "call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." While the instant record does not indicate that the clerk formally spoke the names of prospective jurors on the record, the clerk nevertheless drew names of prospective jurors at random, in open court, and in defendant's presence. *See State v. Tirado*, 358 N.C. 551, 571, 599 S.E.2d 515, 530 (2004) ("[N.C.G.S. § 15A-1214(a)] neither prescribes nor proscribes any particular method of achieving random selection." (citation omitted)), *cert. denied*, 544 U.S. 909 (2005); *State v. Smith*, 352 N.C. 531, 548-49, 532 S.E.2d 773, 785 (2000) (concluding that trial court did not err despite using outdated system of calling jurors because the "random-selection requirement" of N.C.G.S. § 15A-1214(a) was satisfied), *cert. denied*, 532 U.S. 949 (2001). Accordingly, the trial court did not err by permitting the clerk to use this method to draw names of prospective jurors from the jury panel.

**[4]** Defendant also argues that the bailiff's reminders to prospective jurors to refrain from discussing the case or reading media accounts of the case violated defendant's right to presence. The first instance occurred 20 April 2004:

> THE COURT:   Okay. Wait. Let's go ahead and let everybody go to lunch.
>
> BAILIFF
> HILL:        Okay, [y]our Honor.
>
> THE COURT:   I don't think we need—We're probably at a good standing point. You may tell the jurors that are in—back here that they may go to lunch but to be back and ready to go a little bit before 2:00. And make sure they don't discuss the case or talk with anyone about it. And the same with those that are in the jury pool.
>
> BAILIFF
> HILL:        Yes, sir, [y]our Honor.
>
> THE COURT:   Thank you very much.
>
> BAILIFF
> HILL:        Yes, sir, [y]our Honor.

The next instance occurred at the end of the proceedings on 22 April 2004:

> THE COURT:   Okay. Mr. Hill, if you will tell the other jurors to be back here and ready to go at 9:15 or so tomorrow. Remind them not to read any newspaper accounts and not to talk about the case.
>
> BAILIFF
> HILL:        Yes, sir, [y]our Honor.
>
> THE COURT:   Okay. And we will—Ms. Cook, we'll be in recess until 9:30 tomorrow morning.

When court resumed the next morning, the following exchange took place:

> THE COURT:   Okay. Here's what we'll do then. Pick out, call out twelve names, tell them to be back after lunch, say around 1:30, 1:45, something like that. Then the re-

mainder that have not been called out will not have to come back until Monday morning at 9:30.

BAILIFF
HILL:          Yes, sir, [y]our Honor.

THE COURT:  Mr. Hill, please remind them that they're not to talk about the case with anyone and they're not to read any newspaper accounts or any media reports.

Although we reiterate our warning that "shorthand procedures" such as these "may run the risk of violating [a] defendant's right to be present," *State v. Gay*, 334 N.C. 467, 482-83, 434 S.E.2d 840, 848 (1993), the challenged jury management procedures do not constitute reversible error on these facts. In *State v. Gay*, this Court considered two challenges based on a capital defendant's right to presence which bear on the instant case. First, we held that the trial judge's admonitions to prospective jurors outside of defendant's presence did not result in prejudicial error because the record "affirmatively reveal[ed] exactly what the trial court intended to say to the prospective jurors," and there was "no indication that anything to the contrary occurred." *Id.* at 482, 434 S.E.2d at 848. Thus, despite the trial court's error in addressing the prospective jurors outside of the presence of the defendant, the state met its burden of proving that the error was harmless beyond a reasonable doubt. *Id.*

Second, we held that a reminder by the bailiff to prospective jurors and the jury itself to abide by the court's admonitions should not be considered an instruction as to the law, since "[c]ommunications such as these do not relate to defendant's guilt or innocence." *Id.* We further explained that "[t]he subject matter of these communications in no way implicates defendant's confrontation rights, nor would defendant's presence have been useful to his defense . . . . [as] demonstrated by the fact that defendant's attorney had no objection to the shorthand procedure." *Id.* (citation and internal quotation marks omitted).

The present facts are a combination of those involved in the two right-to-presence issues considered in *Gay*. First, as in *Gay*, the record here reflects the specific instructions the trial judge sought to have administered to the jury because the trial judge explicitly told the bailiff the substance of the instructions and asked him to pass them along to the jury. Likewise, there is nothing in the instant record

to suggest that the bailiff did not follow these instructions as ordered. *See State v. May*, 334 N.C. 609, 615, 434 S.E.2d 180, 183 (1993) ("Without anything in the record to show something else happened, we will assume the bailiff followed the court's instructions."), *cert. denied*, 510 U.S. 1198 (1994). Stated succinctly, the record "affirmatively reveals exactly what the trial court intended to say to the prospective jurors" and there was "no indication that anything to the contrary occurred." *Gay*, 334 N.C. at 482, 434 S.E.2d at 848.

Second, as in *Gay*, it was the bailiff who delivered instructions from the trial court to the jury on several occasions, with no objection from defendant to the trial court's shorthand procedures. Here also, the communications "[did] not relate to defendant's guilt or innocence[,] . . . nor would defendant's presence have been useful to his defense." *Id.* (citation and internal quotation marks omitted). Thus, the instructions conveyed by the bailiff "should not be considered an instruction as to the law" outside the presence of a capital defendant. *Id.* Accordingly, although the trial court's shorthand procedure was error, the state has met its burden of proving that the violation of defendant's right to presence was harmless beyond a reasonable doubt. *Id.*; *see also Huff*, 325 N.C. at 27-36, 381 S.E.2d at 649-55 (analyzing various violations of the defendant's right to presence and concluding all were harmless beyond a reasonable doubt).

[5] Next, defendant argues that his right to presence was violated when the trial judge met with the jury to thank them for their service before discharging them. In response to the state's contention that the jury's service was complete at the time of the meeting, defendant notes that the jury marked "NO" on the verdict form next to each mitigating circumstance it found not to exist instead of leaving these spaces blank. For this reason, defendant argues, the jury's role in defendant's trial was not yet complete, because it could still have been polled a second time before it was discharged as to its reasons for making these markings on the verdict form.

We conclude that the trial court did not err in thanking the members of the jury for their service, as the jury's service was complete at the time the trial judge thanked and discharged the jury outside of defendant's presence. This meeting occurred after the jury had delivered its unanimous verdict and been polled at defendant's request, and after the trial court recorded the verdict. It follows then that this meeting occurred after the jury had completed its service. *See Davis v. State*, 273 N.C. 533, 538, 160 S.E.2d 697, 702 (1968) (explaining that

a jury's verdict is "complete" when it is "accepted by the court for its records"). Even if defendant were entitled to a "re-polling" of the jury under these circumstances, he never asked the trial court to do so. Thus, the jury's role in defendant's trial was complete at the time the trial judge met with the jury because defendant waived any purported right to "re-poll" the jury. *See State v. Black*, 328 N.C. 191, 198, 400 S.E.2d 398, 403 (1991) (holding that the right to poll the jury is subject to waiver). Finally, as a practical matter, we fail to see what a second polling of the jury under these circumstances would have accomplished, as the only plausible explanation for why the jury marked "NO" on the verdict form as to each mitigating circumstance at issue is that the jury simply did not find the existence of those mitigating circumstances. *See id.* ("The purpose of polling the jury is to ensure that the jurors unanimously agree with and consent to the verdict at the time it is rendered."). Consequently, defendant's argument is without merit.

## CAPITAL SENTENCING PROCEEDING

Defendant argues that he is entitled to a new capital sentencing proceeding because the trial court erred by denying his request to submit certain mitigating circumstances to the jury. N.C.G.S. § 15A-2000(b) provides, in pertinent part:

> In all cases in which the death penalty may be authorized, the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence, and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances.

Under N.C.G.S. § 15A-2000(b), the trial court is required to include in the written verdict form all statutory mitigating circumstances supported by "substantial evidence." *State v. Zuniga*, 348 N.C. 214, 217, 498 S.E.2d 611, 613 (1998); *State v. Greene*, 329 N.C. 771, 775-77, 408 S.E.2d 185, 186-87 (1991). "The test for determining if the evidence is 'substantial evidence' is 'whether a juror could reasonably find that the circumstance exists based on the evidence.'" *State v. Watts*, 357 N.C. 366, 377, 584 S.E.2d 740, 748 (2003) (citations and internal quotation marks omitted), *cert. denied*, 541 U.S. 944 (2004). We have further explained that "substantial evidence" is "'more than a scintilla of evidence,'" and that the evidence must be "existing and real, not just seeming or imaginary." *State v. Hill*, 347 N.C. 275, 301, 493 S.E.2d 264,

*279* (1997) (quoting *State v. Earnhardt,* 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982) (citation omitted)), *cert. denied,* 523 U.S. 1142 (1998). Defendant bears "the burden of producing 'substantial evidence' tending to show the existence of a mitigating circumstance before that circumstance will be submitted to the jury." *State v. Holmes,* 355 N.C. 719, 736, 565 S.E.2d 154, 166-67 (citations and internal quotation marks omitted), *cert. denied,* 537 U.S. 1010 (2002).

**[6]** Defendant argues that the trial court erred by failing to submit the mitigating circumstance described in N.C.G.S. § 15A-2000(f)(2) because substantial evidence existed that the murder was committed while defendant was "under the influence of mental or emotional disturbance." Defendant contends that under *State v. Greene,* 329 N.C. 771, 408 S.E.2d 185, the trial court was required to submit the (f)(2) mitigator to the jury because there was substantial evidence that defendant suffered from intermittent explosive disorder. Defendant claims this mental illness caused his inability to control his violent actions.

Two of defendant's experts, Dr. Thomas Ansbro and Dr. Thomas Gresalfi, made no mention of intermittent explosive disorder, or any other disorder that would require the submission of the (f)(2) mitigator. Dr. Elizabeth Pekarek, the lone expert who diagnosed defendant with intermittent explosive disorder, did so as a preliminary diagnosis, offering no evidence or testimony to explain the specific symptoms of this disorder or how such symptoms would have affected defendant at the time of the crime. Dr. Pekarek admitted that she was not surprised to learn that a leading diagnostic guidebook for mental health professionals referred to intermittent explosive disorder as a "rare" condition, and that she reached her preliminary diagnosis without following the recommended practice of first ruling out all other disorders associated with aggressive impulses and without ruling out potential malingering. Dr. Pekarek also admitted that she eventually retreated from her initial preliminary diagnosis after learning about defendant's calculated attack on another inmate while in prison, which she believed was inconsistent with intermittent explosive disorder. Notably, on the basis of this evidence, the jury unanimously rejected the following nonstatutory mitigating circumstance submitted on defendant's behalf: "During his detention at the Randolph County [j]ail in 2003, the defendant was diagnosed with Intermittent Explosive Disorder." In sum, the testimony supporting defendant's claim that he suffered from intermittent explosive disorder was inadequate and highly controverted at best. Accordingly, the trial court

**STATE v. BADGETT**

[361 N.C. 234 (2007)]

did not err by refusing to submit the (f)(2) mitigator. *See, e.g., State v. Gainey*, 355 N.C. 73, 103, 558 S.E.2d 463, 482-83 (holding that submission of (f)(2) mitigator was not required when defendant's expert "had reservations" about defendant's diagnosis), *cert. denied*, 537 U.S. 896 (2002); *State v. Hedgepeth*, 350 N.C. 776, 787-88, 517 S.E.2d 605, 612-13 (1999) (concluding that controverted and conflicting evidence did not entitle defendant to submission of the (f)(2) mitigating circumstance), *cert. denied*, 529 U.S. 1006 (2000).

Moreover, the trial court's refusal to admit the (f)(2) mitigating circumstance is appropriate when " '[t]he events before, during, and after the killing suggest[ ] deliberation, not the frenzied behavior of an emotionally disturbed person.' " *State v. Hill*, 347 N.C. 275, 302, 493 S.E.2d 264, 279 (1997) (quoting *State v. Noland*, 312 N.C. 1, 23, 320 S.E.2d 642, 656 (1984), *cert. denied*, 469 U.S. 1230 (1985)), *cert. denied*, 523 U.S. 1142 (1998). Here, defendant stabbed the victim in the neck with a pocketknife requiring both hands to open, then chased the victim into the kitchen, where defendant slashed his arm and pushed him to the ground to prevent him from using the telephone to call for help. Defendant then washed the victim's blood off the murder weapon in the victim's kitchen sink. Next, defendant stole the victim's money and possessions and later returned to the crime scene to steal more items from the victim, including his truck. Defendant also attempted to hide his guilt by disposing of the murder weapon and lying to police. These actions signal deliberation, not the influence of an emotional or mental disturbance at the time of the crime.

Defendant's reliance on *State v. Greene* is also misplaced. In *Greene*, this Court found evidence sufficient to submit the (f)(2) mitigator when there was evidence that defendant "suffered from organic brain damage which resulted in his having poor judgment and a lack of impulse control." 329 N.C. at 775, 408 S.E.2d at 186-87. The facts of the instant case are fully distinguishable from *Greene*, as nothing tantamount to substantial evidence of brain damage was introduced into evidence at defendant's trial. To the contrary, the evidence introduced here revealed the plain inability of defendant to control his temper when the mentally disabled victim pointed at defendant and yelled about "workers of iniquity." To be sure, "[w]e have previously stated that an inability to control one's temper is neither mental nor emotional disturbance as contemplated by [the (f)(2)] mitigator." *State v. Strickland*, 346 N.C. 443, 464, 488 S.E.2d 194, 206 (1997) (citation omitted), *cert. denied*, 522 U.S. 1078 (1998).

Accordingly, the trial court did not err by refusing to submit this mitigating factor to the jury.

[7] Defendant also argues that the trial court erred by failing to submit the mitigating circumstance described in N.C.G.S. § 15A-2000(f)(6) because substantial evidence existed that the murder was committed while "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of [the] law was impaired." Defendant argues that his intermittent explosive disorder led to impulsive and aggressive outbursts in response to minor provocations, and that this evidence is sufficient to require submission of the (f)(6) mitigator to the jury.

For the same reasons that defendant's argument as to the (f)(2) mitigator fails, defendant's argument here fails as well, because there is insufficient evidence in the record that defendant suffered from intermittent explosive disorder. In addition, the same evidence of deliberation which makes submission of the (f)(2) mitigator improper also makes submission of the (f)(6) mitigator improper. In particular, defendant's initial lies to police about his involvement in the murder and his washing and disposal of the murder weapon are especially relevant on the (f)(6) mitigator, because they tend to show that defendant fully appreciated the criminality of his conduct. *See State v. Golphin*, 352 N.C. 364, 476, 533 S.E.2d 168, 240 (2000) (holding trial court properly refused to submit (f)(6) mitigator when there was evidence that defendant initially denied his role in shooting two police officers), *cert. denied*, 532 U.S. 931 (2001). Accordingly, defendant's argument that the trial court erred in refusing to submit the (f)(6) mitigator is without merit.

[8] Defendant next argues that the trial court erred by failing to order a competency hearing *sua sponte* in the presence of an allegedly bona fide doubt as to defendant's competency to stand trial. N.C.G.S. § 15A-1001(a) governs the determination of a defendant's capacity to proceed and provides in pertinent part:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner.

Under N.C.G.S. § 15A-1002(a), "[t]he question of the capacity of the defendant to proceed may be raised at any time on motion by the

prosecutor, the defendant, the defense counsel, or the court[,]" provided that the motion "detail[s] the specific conduct that leads the moving party to question the defendant's capacity to proceed." N.C.G.S. § 15A-1002(b) further provides that "[w]hen the capacity of the defendant to proceed is questioned [pursuant to N.C.G.S. § 15A-1001(a)], the court shall hold a hearing to determine the defendant's capacity to proceed."

In applying these statutory provisions, this Court has recognized that the trial court is only required to "hold a hearing to determine the defendant's capacity to proceed *if* the question is raised." *State v. King*, 353 N.C. 457, 466, 546 S.E.2d 575, 584 (2001) (internal quotation marks omitted), *cert. denied*, 534 U.S. 1147 (2002). Therefore, the statutory right to a competency hearing is waived by the failure to assert that right at trial. *Id.* at 466, 546 S.E.2d at 584-85; *State v. Young*, 291 N.C. 562, 567, 231 S.E.2d 577, 580-81 (1977). Nothing in the instant record indicates that the prosecutors, defense counsel, defendant, or the court raised the question of defendant's capacity to proceed at any point during the proceedings, nor was there any motion made detailing the specific conduct supporting such an allegation. Defendant's statutory right to a competency hearing was therefore waived by the failure to assert that right at trial.

Nevertheless, under the Due Process Clause of the United States Constitution, "[a] criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1996)). As a result, " '[a] trial court has a constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence before the court* indicating that the accused may be mentally incompetent.' " *King*, 353 N.C. at 467, 546 S.E.2d at 585 (alteration in original) (quoting *Young*, 291 N.C. at 568, 231 S.E.2d at 581 (citation and internal quotation marks omitted)). In enforcing this constitutional right, "the standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.' " *Godinez*, 509 U.S. at 396 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam) (internal quotation marks omitted)). Defendant points to evidence in the record indicating that he: (1) wrote numerous letters to the trial court and the district attorney expressing his desire for a speedy trial resulting in a death sentence; (2) read a statement to the jury during the penalty phase in which he impliedly asked for a death sentence; and

(3) had an emotional outburst coupled with verbal attacks on the assistant district attorney who delivered the state's closing argument during the sentencing proceeding.

We conclude that the evidence referenced by defendant did not constitute "substantial evidence" requiring the trial court to institute a competency hearing, and that this evidence was outweighed by substantial evidence indicating that defendant was competent to stand trial. The record shows that defendant was able to interact appropriately with his attorneys during the trial. He conferred with them on issues of law applicable to his case. He followed their advice by declining to testify during the guilt-innocence phase. Defendant also responded directly and appropriately to questioning during the capital sentencing proceeding as well as to the trial court's inquiries throughout the trial.

Defendant also demonstrated a strong understanding of the proceedings against him, and consistently addressed the trial court with appropriate deference and intelligent responses. For instance, defendant had the following exchange with the trial judge:

[DEFENDANT]:  Your Honor?

THE COURT:  Yes, sir.

[DEFENDANT]:  May I address the Court?

THE COURT:  Yes, sir, you may.

[DEFENDANT]:  In that criminal law book it says, I don't know the General Statute, but it says the defendant or defendant's counsel may have the right to the last argument. I was advised by [defense counsel] that I could not address the jury at that time, that I would have to go through [defense counsel]. Is that correct?

. . .

[DEFENDANT]:  Your Honor, may I be allowed to at least say something to the jury before they deliberate on the conviction phase?

Indeed, even after his outburst during the state's closing arguments, defendant calmly and rationally explained that he was upset because he felt the state's closing argument portrayed him as avoiding respon-

sibility for his actions. Defendant then apologized to the trial court for interrupting the proceedings.

We observe that defendant called three experts to testify about his psychological history, yet none of them suggested that he suffered from a condition that would render him incompetent to stand trial. Though the record confirms that defendant was treated for anger management and depression prior to trial, this is insufficient to establish a lack of competency. *See King*, 353 N.C. at 467, 546 S.E.2d at 585 (holding that evidence of treatment for depression and suicidal tendencies several months before trial did not constitute "substantial evidence" requiring the trial court to hold competency hearing).

Finally, we are unable to conclude that defendant's desire for a speedy trial resulting in a death sentence indicates a lack of competence to stand trial. As then-Associate Justice Rehnquist commented in *Lenhard v. Wolff*, 443 U.S. 1306, 1312-13 (1979):

> The idea that the deliberate decision of one under sentence of death to abandon possible additional legal avenues of attack on that sentence cannot be a rational decision, regardless of its motive, suggests that the preservation of one's own life at whatever cost is the *summum bonum*, a proposition with respect to which the greatest philosophers and theologians have not agreed and with respect to which the United States Constitution by its terms does not speak.

Accordingly, we hold that the evidence before the trial court did not constitute "substantial evidence" requiring it to institute a competency hearing *sua sponte*.

## PRESERVATION ISSUES

Defendant raises additional issues that have previously been decided by this Court contrary to his position: (1) whether the short-form murder indictment used to charge defendant is unconstitutional; (2) whether the trial court erred by instructing the jury that it "had to unanimously fail to find the aggravating circumstances sufficiently substantial" before it could recommend a sentence of life imprisonment without parole; (3) whether the trial court erred by instructing the jury that it had a "duty" to recommend that defendant be sentenced to death if it "found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances, when considered with the mitigating

circumstances, were sufficiently substantial to call for the death penalty"; (4) whether the trial court erred by "defin[ing] mitigating circumstances in its charge to the jury as a fact or group of facts which may be considered as 'extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first-degree murders' "; and (5) whether the standards utilized by this Court under N.C.G.S. § 15A-2000(d)(2) to review the proportionality of a jury's determination of death as the appropriate punishment are unconstitutional. We have considered defendant's contentions on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject defendant's arguments.

## PROPORTIONALITY REVIEW

[9] Finally, pursuant to our statutory duty under N.C.G.S. § 15A-2000(d)(2), we must determine: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor"; and (3) whether the death penalty is "excessive or disproportionate to the penalty imposed in similar cases," considering both the crime and the defendant.

Defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation, and under the felony murder rule. The jury found two aggravating circumstances to exist: (1) that "defendant had been previously convicted of a felony involving the use . . . of violence to the person," N.C.G.S. § 15A-2000(e)(3); and (2) that the murder was committed for "pecuniary gain," N.C.G.S. § 15A-2000(e)(6). The trial court submitted the statutory catchall mitigating circumstance on defendant's behalf, N.C.G.S. § 15A-2000(f)(9), but the jury did not find this mitigating circumstance to exist and have mitigating value. The trial court also submitted fourteen additional nonstatutory mitigating circumstances on defendant's behalf, eight of which the jury found to exist and have mitigating value.

Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. We find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Thus, we now address our final statutory duty of proportionality review.

"The purpose of proportionality review is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *Hyatt*, 355 N.C. at 670, 566 S.E.2d 61 at 79 (citations and internal quotation marks omitted). " 'In our proportionality review, we must compare the present case with other cases in which this Court has ruled upon the proportionality issue.' " *Id.* (quoting *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254 (1994)). We have found the death sentence disproportionate in eight cases. *See State v. Kemmerlin*, 356 N.C. 446, 489, 573 S.E.2d 870, 898 (2002); *State v. Benson*, 323 N.C. 318, 328, 372 S.E.2d 517, 522 (1988); *State v. Stokes*, 319 N.C. 1, 27, 352 S.E.2d 653, 668 (1987); *State v. Rogers*, 316 N.C. 203, 237, 341 S.E.2d 713, 733 (1986), *overruled in part on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), *and by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997); *State v. Young*, 312 N.C. 669, 691, 325 S.E.2d 181, 194 (1985); *State v. Hill*, 311 N.C. 465, 479, 319 S.E.2d 163, 172 (1984); *State v. Bondurant*, 309 N.C. 674, 694, 309 S.E.2d 170, 183 (1983); *State v. Jackson*, 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was found guilty of first-degree murder on the basis of malice, premeditation and deliberation, and under the felony murder rule. "We have held that a finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.' " *Hyatt*, 355 N.C. at 670, 566 S.E.2d at 79 (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891 (1994)). Defendant stabbed the victim, then physically restrained him from using his telephone to call for help before watching him bleed to death. At some point in the struggle, defendant also used the pocketknife to slash the victim's right arm, leaving a significant wound. We further observe that the folding pocketknife used to murder the victim had to be pulled open before it could be used, a process that lasted a moment and required the use of both of defendant's hands. *See State v. Forrest*, 321 N.C. 186, 196, 362 S.E.2d 252, 258 (1987) (concluding that sufficient evidence of premeditation existed when the revolver defendant used in the murder "had to be cocked each time before it could be fired"). This evidence of premeditation and deliberation supports the proportionality of the death penalty in the instant case.

Second, the jury found the existence of the (e)(3) aggravating circumstance based upon the defendant's killing of Chriscoe in 1992. We have previously stated that "[t]he jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate." *State v. Lyons*, 343 N.C. 1, 27, 468 S.E.2d 204, 217 (citing *State v. Harris*, 338 N.C. 129, 449 S.E.2d, 371 (1994), *cert. denied*, 514 U.S. 1100), *cert. denied*, 519 U.S. 894 (1996). "In none of the cases in which the death penalty was found to be disproportionate has the jury found the (e)(3) aggravating circumstance." *State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143 · (1999) (citing *Lyons*, 343 N.C. at 27-28, 468 S.E.2d at 217), *cert. denied*, 528 U.S. 1164 (2000).

It is also relevant that defendant murdered the victim in the victim's home, "an especially private place, one in which a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34 (relying on fact that victim was murdered while inside his home in finding death sentence not disproportionate), *cert. denied*, 484 U.S. 970 (1987). In addition, the victim had shown defendant compassion by allowing him to stay overnight as a guest in the victim's home on an occasion weeks prior to the murder, as well as on the night of the murder. In exchange for the victim's kind willingness to provide defendant with shelter from the cold November temperatures, defendant repaid the victim's compassion by senselessly taking his life. *See State v. Carter*, 342 N.C. 312, 329, 464 S.E.2d 272, 283 (1995) (holding death penalty not disproportionate when defendant chose to kill a person "who had treated him with kindness and compassion"), *cert. denied*, 517 U.S. 1225 (1996). This evidence further supports the proportionality of the death penalty in the instant case.

" 'We also compare this case with the cases in which we have found the death penalty to be proportionate.' " *Hyatt*, 355 N.C. at 671, 566 S.E.2d at 80 (quoting *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164). "Although this Court reviews all of the cases in that pool when engaging in its duty of proportionality review, we have repeatedly stated that 'we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *Id.* (quoting *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164). "Whether a sentence of death is disproportionate in a particular case ultimately rest[s] upon the experienced judgments of the members of this Court." *Id.* (citations and internal quotation marks omitted) (alteration in original). We conclude that this case is more similar to cases in which we have found the death penalty proportionate than to those in which we have found it dis-

proportionate. Therefore, based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate.

In sum, we hold that defendant received a fair trial and capital sentencing proceeding free from prejudicial error. Accordingly, the judgment of the trial court sentencing defendant to death must be left undisturbed.

NO PREJUDICIAL ERROR.

Justice HUDSON did not participate in the consideration or decision of this case.