IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-566

No. COA20-475

Filed 19 October 2021

Wake County, No. 16CRS001582-83, 206046

STATE OF NORTH CAROLINA

v.

JON FREDERICK SANDER, Defendant.

Appeal by Defendant from judgments entered 15 April 2019 by Judge A. Graham Shirley in Wake County Superior Court. Heard in the Court of Appeals 25 August 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Teresa M. Postell, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender David W. Andrews, for Defendant-Appellant.*

INMAN, Judge.

¶ 1        Defendant Jon Frederick Sander ("Defendant") appeals from several judgments imposing consecutive life sentences for three counts of first-degree murder. On appeal, Defendant contends that the trial court erred in failing to *sua sponte*: (1) order a third competency evaluation for Defendant; and (2) declare an impasse between Defendant and his trial counsel over jury selection disagreements. After careful review, we hold Defendant has failed to demonstrate error under his

first argument. We dismiss Defendant's second argument, without prejudice to his filing a motion for appropriate relief in the trial court, because the record below does not definitively establish the impasse alleged.

## I.   FACTUAL AND PROCEDURAL HISTORY

The record below tends to show the following:

### 1. *Defendant's History of Mental Illness*

Defendant has a long history of mental illness. He was treated in 2008 in Pennsylvania for anxiety, depression, and insomnia. According to his family and longtime girlfriend, Defendant exhibited aspects of paranoia, including building safe rooms wherever he lived, changing the locks whenever he moved into a new home, and developing "escape plans" should he and his family come under some kind of imminent threat.

In 2011, Defendant was involuntarily committed in Pennsylvania for suicidal thoughts and agitation stemming from a dispute with an ex-employee. Medical records from the commitment proceeding indicated symptoms of delusions/paranoia. They also included notes that he was a "semi-reliable historian" and admitted to "acting delusional and overplay[ing] the issues" related to the ex-employee. After converting the commitment proceeding from involuntary to voluntary, Defendant was diagnosed with bipolar disorder, treated with medication, and discharged with signs of significant improvement.

In 2013, Defendant voluntarily sought psychiatric care again and was diagnosed by a psychologist with ADHD, bipolar I disorder, generalized anxiety, and panic disorder.

In 2014, Defendant moved to North Carolina and began living next door to his business partner and close friend, Sandy Mazzella ("Sandy").  In 2014, Defendant saw his general practitioner who noted that he had stopped taking his medications for bipolar disorder because "it does not make him feel like himself."  During a later visit to that same doctor, Defendant reported that "his bipolar disorder has been stable," his business with Sandy was thriving, and that he "knows that if he gets manic he needs to go to the hospital."

### 2. *Facts Underlying Defendant's Murder Convictions*

Defendant's business and social relationship with the Mazzella family began deteriorating the following year.  Sandy accused Defendant of embezzling money from their business, leading Sandy and his father, Sal Mazzella ("Sal"), to try to expel Defendant from the enterprise.  Sandy and Sal also took a restraining order out against Defendant following alleged threats against them.

On 19 March 2016, Sandy's fourteen-year-old daughter told her mother, Stephanie Mazzella ("Stephanie"), that Defendant had touched her inappropriately, leading the Mazzellas to file a police report against Defendant.  A few days later, Defendant went to the Mazzella's home with a gun and shot Sandy, Stephanie, and

Sal's wife, Elaine. All three victims died. Following a standoff with police at his home, Defendant was arrested for the murders.

### 3. *Defendant's First Competency Evaluation*

¶ 9        Defendant was taken into custody and placed under constant psychiatric observation in a hospital mental health unit. Per a forensic psychiatric evaluator, his observation records generally disclosed "no signs of mental health symptoms," with a few notable exceptions. Beginning on 17 May 2016, Defendant reported hearing "voices in his subconscious mind," though similar reports were determined not to be hallucinations but instead instances of Defendant recalling and replaying past events in his head. In July of 2016, he reported "auditory hallucinations of 'screaming.' " In February of 2017, he claimed evil spirits were bothering him; these reports continued over the course of that month and ceased on 24 February 2017. Some of these reports were noted by Defendant's treatment staff to be "malingering and manipulative." From May 2017 to August 2018, Defendant displayed no concerning symptoms beyond depression.

¶ 10        Defendant's counsel eventually moved for a competency determination. That motion was granted and, following two interviews and a forensic psychiatric evaluation, on 14 November 2018 Defendant was determined competent to proceed. The evaluator based this opinion on her observations that "Mr. Sander amply

demonstrated that the beliefs, whether attributed to sincerity or impression management, did not interfere in his capacity-related abilities."

### 4. *Defendant's Second Competency Evaluation*

¶ 11        Following his evaluation and return to Wake County Detention Center, Defendant grew increasingly antagonistic toward his lead trial counsel, accusing him of conspiring with Sal to frame Defendant. He informed his counsel that he had met with an imaginary correction officer about his case. Defendant said the correction officer stated the State's photographic evidence was doctored and assured Defendant he would ultimately be acquitted on that basis. Defendant also told his attorneys the correction officer was to appear in court on the first day of trial alongside three out-of-town lawyers to file a "class action" against those involved in the conspiracy to convict him of murder.

¶ 12        Defendant's counsel moved for a second evaluation based on the above statements, which the trial court granted on 8 January 2019. Defendant repeated the statements he had made to his trial counsel to the forensic interviewer, telling her that the correction officer would make a public show of proving Defendant's innocence and take down the "legacy" of his lead counsel for framing Defendant. Defendant also said that he believed he would not be found guilty based on his character and that he would accept and work with his attorneys if his predictions regarding the correction officer did not come true. The examiner concluded that

Defendant "continues to make choices regarding his [re]presentation, which may very well be considered self-sabotaging and very poor judgment . . . . These choices are not, however, the result of a psychotic disorder or other loss of capacity for rational thought." The trial court subsequently ruled Defendant was competent to proceed based on the expert conclusions reached in the first and second competency evaluations.

### 5. *Subsequent Pre-Trial Motions*

In advance of trial, Defendant's counsel moved for a third competency hearing, though they conceded that they had "no further evidence to offer the court . . . other than our original [two] applications [for competency determinations]." The trial court denied the motion. Defendant's counsel then moved to have Defendant restrained in handcuffs and ankle restraints based on prior threats to his attorneys and a fear that he may try to steal and use a bailiff's firearm. The trial court denied that motion but ordered all courtroom deputies to unload their firearms.

### 6. *Jury Selection Interruptions*

All three murder charges were joined for trial and jury selection began on 25 February 2019. Defendant was disruptive at various points throughout. On the third day of jury selection, the trial court observed that Defendant "began sitting and acting in an aggressive manner" toward prospective jurors. In response to Defendant's conduct, the trial court excused the jury pool and ordered Defendant be placed in

ankle restraints, all while Defendant argued with the judge and threatened court personnel. Defendant continued his outburst and threw a notepad across the room, leading the trial court to order wrist restraints.

¶ 15    Later that same day, as Defendant's counsel was questioning a potential juror, Defendant expressed that the State's evidence was not credible. The trial court requested Defendant be quiet and Defendant momentarily complied. A few moments later, after a potential juror stated any extreme punishment had to match the crime, Defendant again interjected with a question designed to show that the State's evidence and theory of the crime was unbelievable. The prospective juror was excused from the courtroom, Defendant argued with the judge, asserted his innocence on the record, and ceased speaking. The prospective juror was returned to the courtroom and Defendant remained quiet for the remainder of the day.

¶ 16    Defendant's outbursts continued on the following day. During examination of one potential juror, Defendant interjected to correct a statement by the prosecutor that the Mazzellas owned their home; moments later, Defendant claimed in front of the prospective juror that the photographs of the crime scene were "staged." On both occasions, Defendant was gently admonished by the court before apologizing and ceasing his interruptions. A few questions later, Defendant engaged in a more prolonged outburst, claiming that one of the State's key witnesses would not be testifying because she was too afraid. He also laughed at his lead defense counsel,

and said "your legacy, ha, ha, ha, ha, ha. . . . [Y]our legacy is over." Defendant then threatened others inside the courtroom and was removed ahead of the lunch recess. Before calling the recess, the trial court noted on the record that Defendant "almost seems that he is inviting [further restraints], but I don't know that I'm going to accept his invitation."

¶ 17          Defendant was silent over the next several days of jury selection. On the eighth day, however, Defendant told the trial judge at the outset of proceedings that he believed his counsel had violated their fiduciary duties in sending him a letter requesting guidance as to whether he planned to testify in his own defense. Defendant's concern stemmed from his counsel's understanding that Defendant was claiming the victims were already dead, when Defendant claimed he was asserting: (1) he shot and *wounded* the victims; and (2) Sal then executed the victims. Defendant further expressed that he did not trust his lead counsel, but that he did trust another of his attorneys. The trial court denied Defendant's motion to dismiss his counsel on the basis that they had not violated their duties in seeking guidance and input from him. Later during jury selection, Defendant's counsel asked the court to extend the deadlines for the defense's mitigation experts' opinions so that they could consider Defendant's actions during jury selection and prior to his testifying at trial. The trial court agreed.

¶ 18        As his counsel predicted, Defendant was not finished interrupting *voir dire*. At one point, Defendant asked to speak to the court. After being told to discuss the matter with his counsel and taking a moment to talk with his attorneys, Defendant withdrew the request. Next, as his counsel was questioning another prospective juror, Defendant interjected to question whether it was likely a person would "sexually molest[] a 14-year-old-girl at . . . [a] Super Bowl party at my house with everybody," suggesting that no person would do such a thing in the presence of so many witnesses. Defendant then claimed that the minor had sexually propositioned him the night before, and it would not have made sense for him to decline that advance in private and then pursue it in the presence of others. The prospective juror was excused from the courtroom during this outburst, as was Defendant after threatening others in the courtroom. When Defendant returned, the trial court ordered he be placed in a restraining chair "for control of the courtroom, safety of his counsel and safety of others in the courtroom." Defendant later informed the court, "that will be my last outburst on the Super Bowl thing," prompting the trial court to release him from the restraining chair.

¶ 19        Defendant later objected to the prosecutor's statement to a potential juror that "evidence" of child molestation may be introduced during the trial; Defendant interjected to say that it was actually an "allegation" of molestation before sarcastically denigrating his counsel. That juror was excused from the courtroom,

and Defendant lobbed a non-sequitur at the State, challenging the prosecutor's understanding of controlled substance laws.

¶ 20    Defendant was quiet throughout the remainder of jury selection.

### 7. *Defendant's Conduct During the Guilt/Innocence Phase*

¶ 21    Prior to opening statements, Defendant's counsel informed the court that they were unsure as to whether to present an opening statement because Defendant had given them no direction as to what witnesses to call, what evidence to present, and whether Defendant was going to testify. The trial court explained to Defendant that he had placed counsel in a difficult position and what consequences could follow, leading Defendant to state that he understood the situation and was "going to let [counsel] handle [his defense]." Following a recess so that Defendant could discuss the matter with his counsel, the State and Defendant's counsel both gave opening statements.

¶ 22    Defendant's counsel's opening stressed that the Mazzellas were putting economic pressures on Defendant in their attempts to divest him from the business and had taken legal action against Defendant through applications for protective orders. Defendant's counsel closed by telling the jury Defendant "denies that he killed those three people in that house. He denies that he committed first-degree murder in that house. And you'll hear his testimony as to what occurred in the house."

¶ 23        Defendant's next interjection came during Sal's testimony. Sal, who was in the Mazzella home at the time of the shooting, testified that he was standing in the kitchen when he heard gunshots; he then told everybody in his family to take cover and went into the dining room to find a weapon. When he returned, he saw Defendant shoot his wife after entering the house through the laundry room. Sandy then told Sal to run, so he ran into the woods near the house. Defendant interrupted this testimony, expressing that Sal was not credible. Defendant was removed from the courtroom and the jury was instructed to disregard the outburst and the fact that Defendant was in wrist and ankle restraints.

¶ 24        Defendant was quiet during the remainder of the State's case-in-chief. After the State rested, Defendant told the trial court that he did not wish to testify because "[t]he truth will come out." Defendant's wife then testified in his defense, as did a digital forensic examiner. After Defendant was found guilty on all three counts of first-degree murder, he told the court to "[p]ut me to death, that's what's happening anyway. I was framed. . . . That's the way it is. And justice will be served."

### 8. *Sentencing Phase*

¶ 25        Defendant introduced testimony from several mitigation experts in the sentencing phase of the hearing. His first expert acknowledged Defendant had a history of malingering, but testified she was ultimately unable to confirm he was exaggerating symptoms. His second expert was less circumspect, testifying that

while Defendant was bipolar, he was also falsely magnifying his symptoms. Defendant's third expert, a prison warden who had reviewed Defendant's "demeanor and behavior during judicial proceedings," testified that Defendant's conduct in the courtroom was "disrespectful, threatening and created unwarranted discord," and that it was "highly unusual" for Defendant to have a completely clean disciplinary record over the three years he spent incarcerated pending trial.

The jury unanimously recommended a punishment of life imprisonment without parole, and on 15 April 2019 the trial court entered three judgments to that effect. The trial court adjourned at the conclusion of sentencing, but immediately resumed proceedings seconds later. Once back on the record, the trial court stated that "I'm going to note the defendant's appeal and I'm going to appoint the appellate defender as his counsel." Once Defendant's appeal was noted on the record, the trial court adjourned *sine die*.

Defendant's counsel filed a written notice of appeal later that day; the notice, however, included a file number for only one of Defendant's convictions and incorrectly identified the Supreme Court of North Carolina as the court to which the appeal was taken. Defendant's appellate counsel later filed a petition for writ of certiorari to review the judgments omitted from the written notice in the event Defendant's trial counsel failed to adequately perfect appeals from those convictions.

## II.   ANALYSIS

¶ 28        Defendant contends the trial court erred in failing to: (1) *sua sponte* order a competency hearing based on Defendant's conduct during jury selection and trial; and (2) declare an impasse over Defendant's disagreement with counsel over jury strikes. We first address Defendant's notices of appeal and his petition for writ of certiorari before proceeding to the merits of his appeal.

### 1. *Appellate Jurisdiction*

¶ 29        Defendant seeks a writ of certiorari to review the judgments below in the event the notices of appeal in the record failed to comply with Rule 4 of the North Carolina Rules of Appellate Procedure. The State acknowledges that the trial court noted an appeal by Defendant at the conclusion of the sentencing hearing and further concedes that a writ of certiorari is appropriately within our discretion under the circumstances presented. Assuming *arguendo* that the Defendant has failed to perfect his appeal pursuant to Rule 4(a) of the North Carolina Rules of Appellate Procedure, we grant Defendant's petition in our discretion to review all three of his convictions.[1]

---

[1] Neither Defendant nor the State addresses the defect in the written notice of appeal filed by trial counsel identifying the Supreme Court, rather than this Court, as the court to which Defendant's appeal was taken. *See* N.C. R. App. P. 4(a)(2), (b), & (d) (2021) (providing that written notices of appeal must designate the Court of Appeals as the court to which appeal is taken in criminal cases where the death penalty has not been imposed). This oversight extends to Defendant's petition for writ of certiorari, which explicitly requests certiorari review of only the two file numbers not included in the defective written notice of appeal. However, because neither party contests certiorari review of these judgments, the

### 2. *Defendant's Competency*

Defendant asserts that his constitutional right to due process was violated by the trial court's failure to *sua sponte* conduct a competency hearing based on his erratic conduct in court. *See, e.g., State v. Sides*, 376 N.C. 449, 458, 852 S.E.2d 170, 176 (2020) (recognizing a criminal defendant's constitutional due process right to a *sua sponte* competency hearing). A defendant "is competent to stand trial if 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.' " *Id.* (quoting *Ryan v. Gonzales*, 568 U.S. 57, 66, 184 L. Ed. 2d 528, 539 (2013)). The duty to conduct a *sua sponte* competency hearing is triggered when there is "sufficient doubt of [a defendant's] competence to stand trial," *Drope v. Missouri*, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118 (1975), based upon "substantial evidence before the court indicating that the accused may be mentally incompetent." *State v. Young*, 291 N.C. 562, 568, 231 S.E.2d 577, 581 (1977).

There is no bright-line rule establishing when a *sua sponte* competency hearing is required, as "whether substantial evidence of a defendant's lack of capacity exists . . . requires a fact-intensive inquiry that will hinge on the unique

---

State has not sought to dismiss Defendant's appeal, all three first-degree murder charges were tried jointly, and Defendant's petition further requests that this Court "grant any other relief that it deems proper," in our discretion we allow Defendant's petition to review all three convictions.

circumstances presented in each case . . . [and a] consideration of all the evidence in the record when viewed in its totality." *Sides*, 376 N.C. at 466, 852 S.E.2d at 181-82. Circumstances pertinent to this analysis include "a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope*, 420 U.S. at 180, 43 L. Ed. 2d at 118. Severe mental illness, while relevant, is not dispositive. *See Indiana v. Edwards*, 554 U.S. 164, 178, 171 L. Ed. 2d 345, 357 (2008) (noting a defendant may suffer from severe mental illness and still be competent to stand trial); *cf. State v. Chukwu*, 230 N.C. App. 553, 562, 749 S.E.2d 910, 917 ("A defendant need not 'be at the highest stage of mental alertness to be competent to be tried.' " (quoting *State v. Shytle*, 323 N.C. 684, 689, 374 S.E.2d 573, 575 (1989)). Other relevant factors include, but are not limited to, whether the defendant's actions are: (1) a continuation of previously evaluated symptoms, *State v. Coley*, 193 N.C. App. 458, 461, 668 S.E.2d 46, 49 (2008); (2) indicative of malingering, *Chukwu*, 230 N.C. App. at 563, 749 S.E.2d at 917; (3) the result of an unwillingness to work with attorneys rather than an inability to do so, *id.*; and (4) demonstrative of an understanding of the proceedings, *State v. Badgett*, 361 N.C. 234, 260, 644 S.E.2d 206, 221 (2007).

¶ 32        Defendant points to the following evidence as sufficient to raise a doubt as to his competency: (1) Defendant had a documented history of mental illness; (2) Defendant was not engaging with his attorneys and spoke of "spirits" during pre-trial

preparations; (3) Defendant threatened his attorneys, requiring the trial court to shackle him; and (4) Defendant irrationally failed to contribute to his defense while facing potential capital punishment. We hold that these assertions do not constitute substantial evidence under the totality of the circumstances drawn from the complete record.

¶ 33        Defendant underwent two competency evaluations. Both determined that he was competent to stand trial notwithstanding his mental health diagnoses. Those prior diagnoses—already addressed in earlier competency evaluations—do not suggest incapacity at trial warranting a *sua sponte* competency hearing. *State v. Allen*, 377 N.C. 169, 2021-NCSC-38, ¶ 29 ("[T]he fact that a defendant has received mental health treatment in the past . . . does not, without more, suffice to require the trial court to undertake an inquiry into the defendant's competence on the trial court's own motion."); *Coley*, 193 N.C. App. at 464, 668 S.E.2d at 51 (holding no *sua sponte* competency hearing was required because the irrational behavior at issue was addressed in a prior evaluation deeming the defendant competent).

¶ 34        Defendant's lack of engagement with his attorneys, his threats towards them, and his belief that his attorneys were conspiring with Sal to frame him likewise do not suggest a lack of competency in light of previous evaluations. In fact, the second competency evaluation was conducted to evaluate these exact issues. The forensic

evaluator nonetheless deemed Defendant competent following that examination, stating Defendant:

> has expressed an unwillingness to work cooperatively with his lawyer . . . . This evaluation does not find, though, that [Defendant] lacks *capacity* or *ability* to work with his lawyer in a reasonable and rational manner, should he choose to do so. . . . [Defendant] continues to make [poor] choices regarding his [rep]resentation . . . . These choices are not, however, the result of a psychotic disorder or other loss of capacity for rational thought.

In other words, Defendant's refusal to work with his counsel at trial, his belief he was being framed by them, and his aggression in the courtroom was not new conduct. Instead, these behaviors were the subject of a previous evaluation that determined him competent. As such, these facts do not suggest a change in competency warranting a *sua sponte* hearing under our caselaw. *See Chukwu*, 230 N.C. App. at 563, 749 S.E.2d at 917-18 (holding no *sua sponte* hearing required where the pre-trial competency evaluation deemed the defendant competent despite the defendant's belief that his attorney was working against him); *Coley*, 193 N.C. App. at 464, 668 S.E.2d at 51.

¶ 35 Defendant relies heavily on *State v. Whitted*, 209 N.C. App. 522, 705 S.E.2d 787 (2011), to argue that a *sua sponte* hearing was required. In that case, the defendant had not undergone a competency evaluation prior to trial. *See generally id.* On the third day of trial, the defendant refused to participate, stating that she

would rely on her faith instead. *Id.* at 528, 705 S.E.2d at 791. The defendant was then "brought forcibly into court, handcuffed to a rolling chair after having been tasered, [and began] chant[ing] loudly and s[inging] prayers and religious imprecations." *Id.* at 528, 705 S.E.2d at 791-92. The defendant also confessed her guilt, asserted she did not care about a life sentence, and claimed her attorney was working for the State. *Id.* On appeal, we held that the trial court erred in failing to *sua sponte* order a competency evaluation based on the defendant's in-court conduct. *Id.*

¶ 36        *Whitted* is materially distinguishable. Most critically, in this case Defendant underwent two competency evaluations that focused on the same conduct that later arose at trial. So while Defendant had previously claimed that he spoke to spirits and believed his counsel was trying to frame him, both of those assertions—in a marked departure from *Whitted*—had already been deemed not indicative of incompetency at the time of trial. Further, unlike in *Whitted*, Defendant's outbursts showed an intention to challenge the State's case against him based on a cognizable— however strange—theory that Defendant only wounded the victims and Sal was ultimately responsible for killing them. These contentions by Defendant were considered in the prior evaluations deeming him competent, and thus did not trigger a requirement to conduct a new competency hearing *sua sponte*. *See Chukwu*, 230 N.C. App. at 564-65, 749 S.E.2d at 918 (holding the defendant's consistent assertion

that he was a Nigerian diplomat was not indicative of incompetency requiring *sua sponte* evaluation when a prior evaluation considered this assertion and nonetheless determined the defendant was competent).

¶ 37          Given that Defendant's conduct at trial was largely the same as that examined in the prior competency evaluations finding him competent,[2] his disruptive conduct does not suggest an inability to stand trial. *Id.*; *Coley*, 193 N.C. App. at 464, 668 S.E.2d at 51. The remaining circumstances in the record likewise do not suffice to demonstrate potential incompetency. Defendant's own expert acknowledged Defendant's history of malingering and exaggeration of symptoms for show, an observation echoed by the trial court's own impressions of Defendant. *See Chukwu*, 230 N.C. App. at 563, 749 S.E.2d at 917 (malingering weighed against suggestion of incompetency). Defendant's conduct in the courtroom also stands in contrast to his out-of-court behavior, further suggesting his actions took on a performative aspect. *See id.* at 567, 749 S.E.2d at 920 (noting the contrast between in-court and out-of-court behavior suggested the defendant was competent). Lastly, Defendant's

---

[2] Defendant's assertion in his reply brief that his trial conduct was new and markedly different is simply not borne out by the record. All of Defendant's outbursts and threats to others related to: (1) his belief his counsel was conspiring with Sal to frame him; (2) his belief that Sal was the actual murderer; (3) his claim that photographic evidence of the crime scene had been doctored; and (4) his belief that the conspiracy against him would be revealed, he would be acquitted, and his counsel's "legacy" would be destroyed. These were all addressed in the second competency evaluation deeming Defendant competent to undergo trial.

outbursts, though combative, inappropriate, and at times violent, do show an intent to deny the charges and an implicit understanding of the State's theory of the case and the probative value of the evidence arrayed against him. For example, Defendant interrupted jury selection on several occasions to assert his innocence or question— however untimely or unconvincingly—the believability of some of the State's evidence, demonstrating an understanding of proof, probative value, credibility, reliability, and other concepts important to his defense. The nature of these interjections militates against a determination that substantial evidence warranted a third *sua sponte* competency determination. *See Badgett*, 361 N.C. at 260, 644 S.E.2d at 221 (holding no substantial evidence of potential incompetency in part because the defendant "conferred with [his counsel] on issues of law applicable to his case" and "demonstrated a strong understanding of the proceedings against him").

¶ 38     In sum, Defendant's conduct at trial did not amount to substantial evidence requiring the trial court to *sua sponte* conduct a competency hearing in the face of two prior evaluations concluding he was competent. His actions were all either: (1) the subject of a prior evaluation deeming him competent to stand trial; (2) indicative of an unwillingness—rather than inability—to work with counsel; (3) suggestive of malingering and performative exaggeration; or (4) demonstrative of an understanding of the evidence, charges, and proceeding against him. We therefore

hold, under the totality of the circumstances, that Defendant has not shown error in this regard.

### 3. *Alleged Impasse and Ineffective Assistance of Counsel*

¶ 39        In his final argument, Defendant claims he reached an impasse with trial counsel over the use of jury strikes and was thus denied effective assistance of counsel. Defendant cites to the following exchange in the record for support:

> MR. SANDER: I just want to let you know that I don't think my team here is going to be picking jurors. We went through a bunch of them yesterday that were great. I just want to let you know that's my feeling. We had 22 pretty good people. We'll see what happens today, I guess.
>
> THE COURT: All right. If you want to consult with your attorneys about the selection—I know I've seen them—when they find someone acceptable, they consult with you, but if you would like to consult with them more, you're more than welcome.
>
> MR. SANDER: Yeah, I talked to [defense counsel] . . . yesterday. He asked me about a few of them that I said were good and they were dismissed.

¶ 40        Defendant's discussion with the trial court does not definitively reveal an impasse, as it could conceivably suggest an intention of Defendant to continue to work with his attorneys during jury selection despite his apparent disagreement with some of their strikes. We note Defendant did not raise the issue again in jury selection, during trial, or at sentencing, further suggesting no unresolvable impasse arose. Our Supreme Court has held that, where the record does not clearly disclose an impasse

between a defendant and his trial counsel, the appropriate disposition is to dismiss the appeal without prejudice to filing a motion for appropriate relief with the trial court. *State v. Floyd*, 369 N.C. 329, 341, 794 S.E.2d 460, 468 (2016). Consistent with *Floyd*, we dismiss this portion of Defendant's appeal without prejudice to his right to file such a motion with the trial court on this ground.

## III. CONCLUSION

For the foregoing reasons, we hold Defendant has not shown error in the trial court's failure to conduct a *sua sponte* competency hearing based on Defendant's conduct at trial. We dismiss his remaining argument without prejudice to raising that issue by a motion for appropriate relief.

PETITION FOR WRIT OF CERTIORARI GRANTED; NO ERROR IN PART; DISMISSED IN PART.

Judges WOOD and JACKSON concur.